**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES | |
| v. | No. 02 CR 1050 |
| | Judge James B. Zagel |
| NICHOLAS CALABRESE, *et al.* | |

**MEMORANDUM OPINION AND ORDER**

In light of the substantial likelihood of prejudice, I hereby order the parties in this matter to refrain, during the pendency of the trial, from making extrajudicial statements regarding the merits of this case that a reasonable person would believe could be publicly disseminated. This Order shall not apply to the dissemination of information (bare facts as opposed to opinions, questions, or commentary) regarding scheduling matters or other materials that are a part of the public record.

The publicity surrounding this matter has been substantial. In recent days, coverage of this trial dominated the covers of Chicago and suburban newspapers, was the subject of a front-page, above-the-fold story in another local newspaper, and was featured in the front-page section of a prominent New York newspaper. There is no question but that publicity like that which this case has generated poses certain dangers to the parties' ability to receive a fair trial. *See, e.g., Pennekamp v. Florida*, 328 U.S. 331 (1946). As the presiding judge, I "must be especially vigilant to guard against any impairment of [the parties'] right to a verdict based solely upon the evidence and the relevant law." *Chandler v. Florida*, 449 U.S. 560, 574 (1981).

I do not mean to endorse the idea that a jury is so fragile that it must be protected from media reports of proceedings.[1] The media today is regarded with skepticism, perhaps due to its

---

[1]A jury may, however, need to be protected from intrusive media investigation into the personal lives of its members. While this need, in part, informed my decision to empanel an anonymous jury, it is ancillary to the subject of this Order.

emphasis on commentary. Moreover, jurors who do read accounts of trials in which they participate often regard those reports as incomplete or erroneous. Comments by lawyers appearing in the case and parties, however, stand on a different footing. Jurors may give undue credit to the comments of those who have personally investigated the case, read the files, and are presumed to know the facts better than a member of the media reporting on a case. *See United States v. Scarfo*, 263 F.3d 80, 93 (3d Cir. 2001) ("[e]xtrajudicial statements by attorneys pose a threat to a pending proceeding's fairness because attorneys have access to information through discovery and client communication, and because their statements are likely to be received as especially authoritative.").

Faced with similar problems, courts have employed a melange of strategies designed to minimize the impact that publicity has on jury deliberations. *See, e.g., Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 563-565 (1976). I do not favor imposing, nor would the First Amendment countenance, an order preventing the press from reporting on these proceedings. *See Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966) ("[T]here is nothing that proscribes the press from reporting events that transpire in the courtroom."). However, there is a more narrowly tailored alternative available to me. *See Procunier v. Martinez*, 416 U.S. 396, 413 (1974) (noting that any "limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved"). Rather than limit that which the press may report, I am imposing certain restrictions on what trial participants may say to the media. My hand is much freer to enforce these types of restrictions as opposed to restrictions on the press. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1074 (1991) ("[T]he speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press.").

While the *Sheppard* Court laid out a raft of options (e.g. change of venue, jury

sequestration, etc.), the least restrictive and most effective means in this instance is limiting trial

participants' communications with the media about the case during the pendency of trial.  The jury

is, and will remain, un-sequestered.  Sequestration—in my view—would be a heavy burden on

jurors who are already being called upon to do a great deal in furtherance of their civic duty.

Moreover, change of venue, particularly since we are in the middle of trial, is not practicable.

My decision to restrict trial participants' contact with the media is informed, in part, by

events that have already transpired.  Although we are still only in the early stages of this trial, there

has already been an unauthorized disclosure to the news media of a small portion of the few words

in the *Santiago* proffer that remained sealed.[2]  In addition, one of the trial participants has been

quoted (on more than one occasion, and even subsequent to an oral admonition from the Court)

making arguably prejudicial comments on a web log. "Collaboration between counsel and the press

as to information affecting the fairness of a criminal trial is not only subject to regulation, but is

highly censurable and worthy of disciplinary measures." *Sheppard*, 384 U.S. at 363.

A restriction like the one I am imposing is by no means unprecedented.  The Supreme

Court has instructed that "on several occasions this Court has approved restriction on the

communications of trial participants where necessary to ensure a fair trial for a criminal

defendant." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 n.18 (1984).  In *KPNX Broad. Co. v.

Arizona Superior Ct.*, 459 U.S. 1302 (1982), the Supreme Court denied a request by a media

organization and a group of reporters to stay a judicially imposed gag order restraining trial

participants from speaking directly with the press about a high-profile murder trial.  In that case,

---

[2]On April 19, 2007, the Government—pursuant to my Order—filed an unsealed, but
redacted copy of the *Santiago* proffer.

then-Justice Rehnquist noted that "[t]he mere potential for confusion if unregulated communication between trial participants and the press at a heavily covered trial were permitted is enough to warrant a measure such as the trial judge took in this case." *KPNX*, 459 U.S. at 1306. Furthermore, the Fifth Circuit affirmed a district court's refusal to modify or vacate an order similar to this one. *United States v. Brown*, 218 F.3d 415 (5th Cir. 2000); *see also United States v. Cutler*, 58 F.3d 825 (2d Cir. 1995).

I determine that restricting extrajudicial comments from trial participants will enhance my ability to conduct a fair trial because there is a substantial likelihood that such comments would result in prejudice. First, preventing participants in the trial from making certain comments to the media may serve to limit the volume of coverage and help prevent these proceedings from taking on a carnival-like atmosphere. *See Sheppard*, 384 U.S. at 363 ("The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences."). The news media is bound to write even more about this trial if they receive comments from attorneys who have seen all the discovery, are privy to information under seal, and who have had intimate conversations with their clients. Second, I fear that in the event a juror does see a media report, either intentionally (in contravention of my instructions) or inadvertently, comments from attorneys could be particularly prejudicial. *See Gentile*, 501 U.S. at 1074 (noting that "[e]xtrajudicial comments on, or discussion of, evidence which might never be admitted at trial and *ex parte* statements by counsel giving their version of the facts obviously threaten to undermine [the] basic tenet" that the outcome of a trial must be decided by impartial jurors); *see also Scarfo*, 263 F.3d at 93. Because I conclude that this step will increase the chances that the parties will receive a fair trial, I am limiting the ability of trial participants to comment to the media.

The risk that jurors will be prejudiced by news reports that simply recite that which happened in open court is quite small. Even if seen, heard, or read, such reports merely reiterate that to which the juror has already been exposed. Commentary or spin is different. It does not merely reiterate what has already been before the jury; it applies the speaker's own gloss to material presented to the jury. It is, at best, comprised of material suitable for closing argument. There is a time for closing argument—it comes at the end of the case, not at the end of each court day.

I am very cognizant of the First Amendment rights that the participants in this trial enjoy. However, I am also mindful of the Supreme Court's teaching that "[a]lthough litigants do not surrender their First Amendment rights at the courthouse door, those rights may be subordinated to other interests that arise . . . ." *Seattle Times Co.*, 467 U.S. at 32 n.18 (internal citation omitted). I have carefully weighed the parties' constitutional right to a fair trial against the trial participants' rights under the First Amendment. I believe this Order strikes the proper balance.

ENTER:

James B. Zagel
United States District Judge

DATE: Jul 13, 2007

5